| | | |
|---|---|---|
| **MARITHA HUNTER-BUTLER for** | ) | |
| **A.B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:05cv2110 TCM** |
| | ) | |
| **LINDA S. McMAHON, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision

of Linda S. McMahon, the Acting Commissioner of Social Security ("Commissioner"),

denying A.B. ("Plaintiff") supplemental security income benefits ("SSI") under Title XVI

of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d. Plaintiff has filed a brief

in support of his complaint; the Commissioner has filed a brief in support of her answer.

The case is before the undersigned for a final disposition pursuant to the written consent

of the parties. See 28 U.S.C. § 636(c).

## Procedural History

---

[1] Ms. McMahon was appointed Acting Commissioner of Social Security on January 20, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

After the Social Security Administration determined that Plaintiff's speech and learning impairments had improved to the extent that he was no longer disabled as of October 15, 2003,[2] Plaintiff's mother, Maritha Hunter-Butler, requested reconsideration of the decision and requested a disability hearing. (R. at 114-15, 117-20.)[3] Following that hearing and the introduction of additional evidence, the initial decision that Plaintiff's disability had ceased was affirmed. (Id. at 90-105, 107.) Ms. Hunter-Butler contested that decision and requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 89.) The hearing was held in December 2004 before ALJ Joseph J. Simeone. (Id. at 38-84.) The ALJ determined that Plaintiff's disability had ceased on October 15, 2003, and that he was, therefore, not eligible for SSI after December 31, 2003, "the end of the second calendar month after the month in which the disability ended." (Id. at 12-23.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 4-6.)

## Testimony Before the ALJ

Plaintiff and Ms. Hunter-Butler both testified at the administrative hearing.

---

[2]Plaintiff had been awarded benefits in April 2000 with an onset date of January 1, 2000. (Id. at 12.)

[3]References to "R." are to the administrative transcript filed by the Commissioner with her answer.

Ms. Hunter-Butler testified that Plaintiff was born on December 19, was seven years' old,[4] and was then in second grade.  (Id. at 44.)  Plaintiff had two brothers, one was ten years' old, the other was five.  (Id. at 54-55.)  She was a full-time nursing student at a community college and would graduate in May 2006.  (Id. at 57, 59.)  In addition to the SSI for Plaintiff, she received $600 monthly in child support for the two oldest sons, $400 in child support for the youngest, and $429 in food stamps.  (Id. at 57-58.)

In addition to Plaintiff's regular teacher, he saw a speech pathologist, Heather Little, every day for a total of 30 minutes each week and an occupational therapist every Wednesday and Friday.  (Id. at 45-46.)  The occupational therapist worked on Plaintiff's fine motor skill problems, e.g., grasping pens or pencils.  (Id. at 47, 54.)  Plaintiff had difficulty being understood and in understanding.  (Id. at 47.)  Plaintiff could run, jump, walk, and stand.  (Id. at 49-50.)  His primary problem was his language deficiency.  (Id. at 50.)  He thought "slower" than normal, but he had commonsense.  (Id. at 50-51.)  He had to take a minute to absorb what people were saying.  (Id. at 54.)  His asthma was sometimes out of control.  (Id. at 51.)

Ms. Hunter-Butler drove Plaintiff to school and picked him up.  (Id.)  He was having a problem with being possessive and dominant.  (Id.)  He became frustrated when he was not verbally understood.  (Id.)  He yelled at other children and at home.  (Id. at 52.)  He was an average reader, although he had difficulty relating what he had read.  (Id. at 56,

_____

[4]The record reflects that Plaintiff was born in 1996.

59.)  He could do simple math problems.  (<u>Id.</u> at 59.)  He had difficulty doing his homework and was disruptive in class because he could not sit still.  (<u>Id.</u> at 60, 62.)  She had to repeat herself four to five times when asking him to do something.  (<u>Id.</u> at 61.)  The slightest disruption would distract him.  (<u>Id.</u>)  Plaintiff did not accept criticism or correction.  (<u>Id.</u> at 62.)

Other children did not stay friends with Plaintiff because of his aggressive behavior.  (<u>Id.</u> at 53.)  Plaintiff did not play on any sports teams.  (<u>Id.</u>)  He did play computer games.  (<u>Id.</u>)

Ms. Hunter-Butler helped Plaintiff dress; he could not tie his own shoes.  (<u>Id.</u> at 52-53.)  He could brush his teeth by himself.  (<u>Id.</u> at 63.)  He can zip up his pants, but not button them.  (<u>Id.</u>)

The medication, Stratera, Plaintiff was taking for his attention deficit hyperactivity disorder ("ADHD") caused a loss of appetite.  (<u>Id.</u> at 54, 63.)  Consequently, Plaintiff had lost weight.  (<u>Id.</u> at 54.)  He used Albuterol and Pulmicort twice a day for his asthma.  (<u>Id.</u> at 63.)  He used Prednisone when his asthma was out of control.  (<u>Id.</u>)  This happened once very two months.  (<u>Id.</u> at 65.)  He had had several asthma attacks at school within the last month.  (<u>Id.</u> at 64.)  If he took his medicine as instructed, he had an asthma attack once a month.  (<u>Id.</u>)  He missed school once or twice a month because of his asthma.  (<u>Id.</u>)

Plaintiff testified that he could read by himself and could write some.  (<u>Id.</u> at 69.)  He could do simple subtraction and addition, but did not understand the concept of

negative numbers.  (Id. at 70.)  He got along with his two brothers.  (Id. at 71.)  When the ALJ informed him that his teacher "says he is a very cute little boy," he replied, "No, she doesn't."  (Id.)  His mother said that.  (Id.)  Plaintiff was good at drawing.  (Id. at 72.)  He liked to play football, basketball, and soccer.  (Id. at 73, 81.)  He played with his brothers, sat still in school, minded the teacher, dressed himself, and brushed his teeth.  (Id. at 74, 78.)  He could not tie his shoes.  (Id. at 74.)  He took a bus to school.  (Id. at 75.)  Asked what he would do if he was home alone and the television caught on fire, he explained he would get out of the house and dial "911."  (Id. at 76.)   Plaintiff went to bed at 9 o'clock.  (Id. at 78.)  He could tell time.  (Id.)  His mother helped him dress.  (Id. at 80.)  She picked out his clothes.  (Id.)

Plaintiff further testified that he did not yell at school and was quiet in class.  (Id. at 77.)  He did the homework his teacher gave him.  (Id.)  His favorite subjects were reading and math.  (Id. at 81.)

He went to a doctor, Dr. Nash, who gave him shots.  (Id. at 72.)

## Medical, School, and Other Records Before the ALJ

The documentary record before the ALJ included records completed on Plaintiff's behalf, school records, and medical records.

A function report completed by Ms. Hunter-Butler in April 2003 described Plaintiff as limited in his ability to communicate, progress in learning, and "pay attention and stick with a task."  (Id. at 177-78, 182.)  His ability to communicate was limited in that he could

not deliver telephone messages, repeat stories he had heard, tell jokes or riddles accurately, explain why he did something, or use "sentences with 'because,' 'what if,' or 'should have been.'" (<u>Id.</u> at 177.)  His ability to progress in learning was limited in that he could not (a) read and understand stories in books or magazines, (b) write in script, (c) spell most three to four letter words, (d) write a simple story with six to seven sentences, (e) add and subtract numbers over ten, (f) understand money, i.e., make correct change, and (g) tell time.  (<u>Id.</u> at 178.)  His ability to pay attention and stick with a task was limited in that he did not finish things he started and did not complete chores "most of the time."  (<u>Id.</u> at 182.)  He did complete homework, work on art projects, and keep busy on his own.  (<u>Id.</u>)  Plaintiff's physical abilities were limited in that he did not or could not ride a bike, jump rope, roller blade or skate, swim, work video games, or dress and undress dolls or action figures.  (<u>Id.</u> at 179.)  He had difficulty using scissors and correctly holding pencils and crayons.  (<u>Id.</u>)  Although he had friends his own age and generally got along with adults, including his teachers, he could not make new friends and did not play team sports.  (<u>Id.</u> at 180.)  Plaintiff also had difficulties using a zipper by himself; buttoning clothes; tying shoelaces; taking a bath or shower without help; combing, brushing, or washing his hair; choosing his clothes; hanging up his clothes; helping around the house; obeying safety rules; getting to school on time; and accepting criticism or correction.  (<u>Id.</u> at 181.)  He had no problems seeing or hearing.  (<u>Id.</u> at 175.)

Also in April 2003, Ms. Hunter-Butler completed a questionnaire on Plaintiff's behalf. (Id. at 183-90.) Plaintiff was then in a special education program and was receiving speech and language therapy 90 minutes each week and occupational therapy 30 minutes each week. (Id. at 184.) Seven months later, she completed another questionnaire. (Id. at 165-72.) Plaintiff had completed the first grade. (Id. at 165.) He remained in a special education program and continued to receive speech and language therapy and occupational therapy, both for 60 minutes each week. (Id. at 166, 168.)

When requesting reconsideration of the decision to stop Plaintiff's SSI benefits, Ms. Hunter-Butler reported in November 2003 that she spoke with Plaintiff's home room teacher every day. (Id. at 152.) Plaintiff was having a difficult time following instructions and completing his assignments due to his lack of motor control and his speech and language impairment. (Id.)

In March 2004, Ms. Hunter-Butler reported that a new Individualized Education Program ("IEP") for Plaintiff reflected continuing problems with his speech. (Id. at 129.) His language therapy and occupational therapy time had been increased. (Id.) On February 20, he had been diagnosed with a language impairment in addition to his speech impairment. (Id.) Plaintiff's pediatrician, Dr. Alison Nash, had referred him to a psychiatrist, and he had an appointment with one, Dr. Reising, on May 13. (Id. at 130-31.) She also reported that Plaintiff needed help with his personal hygiene, including bathing and brushing his teeth. (Id. at 133.)

Plaintiff's school records included progress reports, documents relating to his IEPs, and questionnaires completed by his teachers.

Plaintiff was evaluated shortly after his second birthday for participation in the First Steps program. (Id. at 380-90.) His mother expressed concern that Plaintiff was not following directions and was not talking. (Id. at 380.) The only command he understood was the one to eat. (Id. at 389.) He whined or cried to get his needs met. (Id. at 380, 384.) The Hawaii Early Learning Profile indicated a 50% delay in cognitive and language development. (Id. at 381.) There was only a two-month delay in his fine motor skills and a one-month delay in "self-help." (Id.) He was advanced in the areas of social skills and gross motor skills. (Id.) He was to be referred for speech and language intervention. (Id. at 390.)

An IEP program was developed for Plaintiff in November 2001, when he was in prekindergarten. (Id. at 256-67.) Because of his delayed language and fine motor skills, he was to receive 630 minutes each week in an early childhood special educational classroom, 60 minutes each week of speech and language therapy, and 30 minutes each week of occupational therapy. (Id. at 265.)

The following February of 2002, Plaintiff was again reevaluated. (Id. at 248-55.) A 1.0 standard deviation below cognitive ability for children of kindergarten age eligible was required to be diagnosed as a student with a language impairment. (Id. at 250.) Plaintiff's score on the Leiter International Performance Scale-Revised was 1.0 standard

deviation below his I.Q. score of 88, a score in the low average range. (Id.) This I.Q. score possibly "represent[ed] somewhat of an underestimate of his present level of functioning" due to his rapid responses and distractability during questioning. (Id.) Regardless, the pattern of his performance was valid. (Id.) His "significant" language deficits negatively affected his school functioning. (Id.) He demonstrated a strength in his ability to name objects and actions in pictures, but weaknesses in his ability to follow oral directions, identify basic concepts in pictures, identify sentence structure in pictures, listen to and recall sentences, and formulate complete sentences within the context of test questions. (Id. at 250-51.) It was concluded that Plaintiff needed a structured language-based program focusing on following directions, understanding basic concepts, answering questions, and describing activities. (Id. at 251.)

An IEP was developed for Plaintiff in May 2002, at the end of prekindergarten. (Id. at 234-47.) His delayed motor and communication skills were assessed as negatively affecting, among other things, his ability to communicate his wants and needs, to be understood, to follow directions, and to socialize appropriately with his peers. (Id. at 235.) Three goals relating to his fine motor skills were developed. (Id. at 237.) He was to participate in the regular education program with the exception of 120 minutes each week of special educations services. (Id. at 241.) Consequently, Plaintiff would be outside the regular class less than 21% of the time. (Id.)

Plaintiff's IEP was revisited and revised at the end of kindergarten. (<u>Id.</u> at 217-33, 359-76.) His language impairment was described as affecting his educational progress in understanding and using content presented in a general education setting; following directions; answering questions; understanding and using vocabulary; and expressing ideas in verbal form. (<u>Id.</u> at 218, 360.) His mother expressed concern that he was easily frustrated and reacted inappropriately at times. (<u>Id.</u>) Since his last IEP, Plaintiff had improved in his ability to follow one-step directions, to identify and use vocabulary in complete sentences, and to communicate his wants or needs in complete sentence structures. (<u>Id.</u> at 219, 361.) He continued to have difficulty with fine motor control; consequently, his occupational therapy time was increased to 60 minutes each week. (<u>Id.</u>) His language therapy time was increased from 90 to 120 minutes each week. (<u>Id.</u> at 219, 231, 361, 374.) His remaining school time was spent in the general education curriculum. (<u>Id.</u> at 219, 361.) It was noted that Plaintiff did not "exhibit behaviors that impede[d] his . . . learning or that of others." (<u>Id.</u> at 221, 363.) As of the IEP date, May 2003, Plaintiff had achieved 100% of his goal to follow one-step directions; 85%, with prompts, of his goal to demonstrate understanding after listening to a short story; 66% of his goal to demonstrate understanding of vocabulary after listening to a short story; and 50% of his goal to use simple, grammatical sentences to communicate his wants and needs. (<u>Id.</u> at 222, 365.) Six new goals were formulated for him for the next school year. (<u>Id.</u> at 223-25, 366-68.)

Also in May 2003, Plaintiff's kindergarten teacher, Ms. Paula Smith, completed a questionnaire asking about Plaintiff's ability to function in various domains. (Id. at 270-75.) He was receiving language therapy 90 minutes a week and occupational therapy 30 minutes a week. (Id. at 270.) Ms. Smith reported that Plaintiff had a slight problem in three of ten activities involving acquiring and using information and no problem in four of the activities.[5] (Id. at 271.) The remaining activities were not applicable to kindergarten, e.g., expressing ideas in written form. (Id.) She noted that Plaintiff had had some difficulty at the beginning of the year following instructions, but his only current problem was in motor control. (Id.) He had difficulty grasping pencils and using scissors. (Id.) She could understand almost all of Plaintiff's speech on the first attempt.[6] (Id. at 272.) Plaintiff had no problems moving about and manipulating objects. (Id.) In caring for himself, Plaintiff had no problem in all but one of the ten activities. (Id. at 273.) In that one activity – caring for his physical needs – he had a slight problem. (Id.) He used an inhaler at school. (Id. at 274.)

Plaintiff's first grade teacher, Ms. Aumiller, and the school nurse, Ms. DuPree, completed the same form questionnaire in November 2003. (Id. at 194-201.) They had known Plaintiff since August 18, 2003. (Id. at 194.) He was often tardy. (Id.) Ms.

---

[5]The individual activities in each of the domains vary slightly from the activities listed in the questionnaire submitted by Plaintiff's attorney.

[6]The only other options for rating how much of a child's speech could be understood by a familiar listener were less than "almost all." (Id. at 272.)

Aumiller saw him for all subjects, although he had language therapy 120 minutes each week. (Id.) She reported that he had a slight problem in three of ten activities involving acquiring and using information, an obvious problem in six activities, and a serious problem in one activity. (Id. at 195.) There was no activity in which he either had no problem or a very serious problem. (Id.) She noted that he usually needed extra help, particularly with reading and math skills and when new concepts were introduced. (Id.) Rating Plaintiff's ability to attend and complete tasks, Ms. Aumiller assessed him as having no problem in one of the thirteen activities; a slight problem in three activities; an obvious problem in seven; and a serious problem in two – organizing his things or school materials and completing work accurately without careless mistakes. (Id. at 196.) These problems occurred daily. (Id.) She noted that Plaintiff worked well independently and tried to do his best. (Id.) His tardiness resulted in him often not hearing instructions. (Id.) In the domain of interacting and relating with others, Plaintiff had no problem in eight of thirteen activities; a slight problem in four activities; and an obvious problem in only one activity – "[i]nterpreting meaning of facial expression, body language, hints, sarcasm[.]" (Id. at 197.) It had not been necessary to implement any behavior modification strategies, although he had had a tendency to cover his face whenever she tried to help. (Id.) This tendency was lessening. (Id.) Ms. Aumiller could understand almost all of Plaintiff's speech on the first attempt. (Id. at 198.) Plaintiff had no problems moving about and manipulating objects. (Id.) In caring for himself, Plaintiff had no problem in four of the

ten activities; a slight problem in one activity; an obvious problem in three activities; and a serious problem in two activities – handling frustration appropriately and responding appropriately to changes in his own mood.  (Id. at 199.)  The former occurred weekly; the latter occurred daily.  (Id.)  When Plaintiff did get frustrated, he did not get angry; rather, he "shut down."  (Id.)  He became embarrassed if he did not understand something, although he did not appear to mind leaving the room for special education services.  (Id.)  He used an inhaler at school for his asthma, but he did not take any medication at school for his ADHD.  (Id. at 200.)

Ms. Aumiller also completed a Vanderbilt Teacher Behavior Evaluation Scale submitted by Plaintiff's pediatrician within a month after Ms. Aumiller first met him.  (Id. at 204-05.)  She reported that he "very often" failed to give attention to details or made careless mistakes in his schoolwork; had difficulty sustaining attention in tasks or activities; was easily distracted by extraneous stimuli; fidgeted or squirmed; was "'on the go'" or often acted as if he was "'driven by a motor'"; talked excessively; blurted out answers before the questions had been completed; was self-conscious or easily embarrassed; and blamed himself for problems.  (Id.)  His academic performance was described as "average."  (Id. at 205.)  His relationship with his peers was "above average." (Id.)

The speech pathologist, Ms. Little, completed a questionnaire in November 2003, reporting that Plaintiff continued to have difficulties with semantics and syntax and with

concepts and vocabulary activities in the classroom. (Id. at 193.) He also had difficulty following directions and answering questions. (Id.) He was making progress with one-step directions, answering easy questions, and identifying vocabulary. (Id.) He had 120 minutes each week of language therapy. (Id. at 192.) She had requested additional testing due to Plaintiff's distortion of "s" and "z". (Id.)

The same month, a speech pathologist reported that Plaintiff had improved in his ability to follow one-step directions with linguistic concepts, to answer comprehension questions after listening to a story, to identify and label vocabulary with cues, and to produce syntactically correct sentences with a model or cues. (Id. at 276.) Regardless, his language impairment affected his understanding and use of content and his abilities to follow directions, to answer questions, to understand and use vocabulary, and to verbally express his ideas. (Id.)

An assessment report completed for Plaintiff noted that he "ha[d] many literary strengths. He [was] able to integrate different clues and read[] fluently. . . . He [was] also able to hear and record many sounds[.]" (Id. at 357.) It was also noted on a separate report that Plaintiff "need[ed] to assume more responsibility for getting assignments completed and turn[ed] in on time." (Id. at 356.)

In January 2004, when Plaintiff was in first grade, he was again reevaluated. (Id. at 209-16.) It was noted that his previous diagnosis of language impaired and speech impaired had been modified to language impaired in the areas of semantics and syntax and

speech impaired involving a sound system disorder. (Id. at 209, 213.) It was further noted that:

> [Plaintiff] approached the testing session in a cooperative and friendly manner. Rapport was readily established and easily maintained. [Plaintiff] was able to converse informally with examiners, made good eye contact and demonstrated a good sense of humor. [Plaintiff] was eager to please and exhibited good effort. He was occasionally distracted by external and internal stimuli and at times required restructuring, refocusing and repetition in order to attend and respond to test items. Activity level was observed to be within normal limits for age although at times he became restless, demonstrated difficulty remaining seated, and required breaks. However, [Plaintiff] was easily refocused to the task and continued to be a willing worker. It is felt that [Plaintiff's] current test performance reflects a valid measure of his present level of functioning.

(Id. at 213.) His full scale score of 87 on the Wechsler Intelligence Scale for Children - IV ("WISC-IV") placed him in the low average range of intelligence. (Id. at 211, 213.) His scores on the four indices of the WISC-IV – verbal comprehension, perceptual reasoning, working memory, and processing speed – "indicate[d] a relatively even pattern of skill development with no significant difference noted among the four indices." (Id. at 213.) His scores on an achievement test indicated that he was performing at or above expectancy in reading, math, and written language. (Id. at 214.) Adjustments in his ADHD medication had resulted in "considerable improvement" in Plaintiff's "ability to attend in the classroom." (Id.)

At Ms. Hunter-Butler's request, Plaintiff was evaluated by a speech-language pathologist, Bridgette Goodwin, M.S., at the Belle Center in February 2004. (Id. at 279-81.) Ms. Goodwin tested Plaintiff at his home to determine his knowledge of semantics

and syntax and his abilities to listen and speak.  (Id. at 279.)  Plaintiff's scores on the Test of Language Development-Primary ("TOLD-P;2") indicated that he was at least above average for two of the seven subtests, picture vocabulary and word discrimination; below average on two other subtests, oral vocabulary and grammatic understanding; and poor on the remaining three subtests, sentence imitation, grammatic completion, and word articulation.  (Id. at 280.)  Certain of these subtests were combined to reflect Plaintiff's overall language ability, his listening ability, his speaking ability, and his semantic ability.  (Id. at 280-81.)  His scores in the listening and semantics quotients were in the average range; his scores in the remaining quotients were below average.  (Id. at 281.)

The next day, Ms. Little noted that Plaintiff continued to require language support.  (Id. at 277.)  "His goal areas include:  linguistic concepts, following directions, vocabulary skills, answering wh-questions [what, why, where], and using correct sentence structure."  (Id.)

A few weeks after the Belle Center evaluation, the IEP for Plaintiff was reviewed.  (Id. at 323-42.)  The following was noted about Plaintiff since his IEP of the previous May:

> [H]e has made some nice gains.  [Plaintiff] has made progress in following 1-step directions involving concepts/vocabulary.  He requires much review and instruction for concepts but then catches on the task.  [Plaintiff] has made great progress at labeling vocabulary; however, describing and completing vocabulary tasks are more difficult.  He has worked on categories, associations, and comparisons.  Progress has been noted but continued drill is needed.  In the areas of answering wh-questions, [Plaintiff] is inconsistent from day to day.  It is more difficult for [Plaintiff] to answer

questions after a story then in isolation.  Nice progress has been noted in answering questions in isolation. . . .  In the area of syntax, [Plaintiff] can use good sentence structure when given a model to follow:  however, his oral expression breaks down during spontaneous oral expression tasks.  In the area of fine motor, [Plaintiff] met his goal on being able to cut, paste and assemble projects correctly.  He has made progress in the area on [sic] wiring using manuscript and can write 20/26 letters in lower case and upper case correctly.

(Id. at 325.)  It was further noted that the recent reevaluation "revealed a low-average cognitive potential with difficulties noted in following directions, answering questions, and working memory." (Id. at 326.)  His reading, math, and written language skills were in the average range.  (Id.)  He had weak oral motor skills.  (Id.)  "In summary, [Plaintiff] continue[d] to have a language impairment in the areas of syntax and semantics, speech impairment in a sound system disorder, and fine motor weaknesses." (Id.)  Five goals were described.  (Id. at 330-32.)  One only was directed at Plaintiff's fine motor skills and that was for him to correctly write 24 of 26 upper and lower case letters and to demonstrate appropriate spacing between words.  (Id. at 332.)  Plaintiff's diagnosis was revised to add a speech impairment with sound system disorder.  (Id. at 338.)  His minutes of special education were to be increased accordingly.  (Id.)  He was to receive 120 minutes weekly of language therapy, 30 minutes weekly of speech therapy, and 60 minutes weekly of occupational therapy.  (Id. at 333.)  Plaintiff passed a hearing and vision test.  (Id. at 337.)

Plaintiff's first grade report card reflected the progress noted in the 2004 IEP.  (Id. at 346-50.)  He was described as making adequate progress in using appropriate capitalization and spacing.  (Id. at 348.)  He met expectations in using sound spelling.  (Id.)

He was making adequate progress in listening and following directions. (Id. at 350.) He met expectations in following rules and working independently. (Id.)

In December 2004, Plaintiff's second grade teacher completed a School Activities Questionnaire submitted by his attorney. (Id. at 392-96.) In the domain of acquiring and using information, she assessed his level of limitation as "marked" in six of the eleven activities: applying problem solving skills; reading comprehension; comprehending and following oral instructions; following and understanding classroom discussions; expressing ideas in writing; and discussing history and science. (Id. at 393.) His level of limitation was "slight" in the activities of learning new material; discussing previously learned material; applying such material; and participating in class discussions. (Id.) He had no limitation in solving math problems. (Id.) In no activity was his level of limitation considered extreme. (Id.) In the seventeen activities in the domain of attending and completing tasks, Plaintiff had a marked level of limitation in eight: focusing and maintaining attention; working without needing task redirection; avoiding careless mistakes; maintaining pace; carrying out instructions; avoiding being fidgety, overactive, or restless; controlling impulses; and remembering and organizing school materials. (Id. at 394.) He had a slight limitation in eight activities: remaining alert; carrying through and finishing activities; changing activities easily; working independently; avoiding becoming easily frustrated; looking ahead and predicting possible outcomes before acting; anticipating the time needed to finish a task; and completing classroom activities on time.

(Id.)  He had no limitation in completing homework assignments on time.  (Id.)  In only one of nineteen activities in the domain of interacting and relating with others was Plaintiff's level of limitation marked; the activity was speaking intelligibly.  (Id. at 395.) He had a slight level of limitation in seven activities:   obeying authority; initiating conversation; taking turns in and maintaining a conversation; using appropriate facial expressions; tolerating differences; and considering others' feelings and points of view. (Id.)   In the four activities in the domain of moving about and manipulating objects, Plaintiff had a marked level of limitation in one activity – using fine motor skills – and no limitation in the remaining three activities.  (Id. at 396.)  He had no limitation in any of the eight activities in the domain of caring for himself, including in hygiene and in using language sufficiently to express his basic wants and needs.  (Id.)

After the first quarter of second grade, Plaintiff either met expectations or was making adequate progress in each area evaluated.  (Id. at 443-44.)  In eleven categories of learning behavior, Plaintiff was inconsistent in six:   following directions; working independently; attending to tasks; socializing at appropriate times; completing work on time; and showing quality in his work.  (Id. at 445.)  He needed improvement in only one area, listening attentively.   (Id.)   His behavior was appropriate when following rules, demonstrating effort, showing respect for others, and participating.  (Id.)  His teacher noted that he was "off to a good start in second grade."  (Id.)  He could, however, "make bigger

gains if he could concentrate longer on tasks." (Id.) He had difficulty with self-control. (Id.)

Records before the ALJ also included Plaintiff's medical records from his pediatricians' office.

At his three-week check-up by Alison Nash, M.D. ("Dr. Nash") in January 1997, Plaintiff was diagnosed with colic. (Id. at 311, 429.) Otherwise, he was described as a "well baby." (Id.) Three months later, in April, he was again described as a "well baby." (Id. at 308, 426.) In June, Petitioner was given a check-up by Dr. Nash. (Id. at 307, 425.) His mother reported that he was congested and irritable and he had a rash on his face. (Id.) Dr. Nash concluded that he was in good health and was teething. (Id.)

On January 6, 1998, Plaintiff was treated by a pediatric nurse practitioner in Dr. Nash's office for a cold and ear pain. (Id. at 306, 424.) He was given an antibiotic. (Id.) The next month, Plaintiff was examined by Dr. Nash for complaints of a fever and ear infection of two days' duration. (Id. at 305, 423.) He was diagnosed with acute otitis media and prescribed an antibiotic. (Id.)

Plaintiff underwent an unremarkable annual examination on March 10. (Id. at 304, 422.)

Two weeks later, Plaintiff was examined by a pediatric nurse practitioner for a swollen penis. (Id. at 303, 421.) In August, Plaintiff was seen by another pediatric nurse

practitioner for a rash on his left leg and watery stool.  (Id. at 302, 420.)  Three months later, he was seen for a stuffy nose.  (Id. at 301, 419.)

Homer Nash, M.D., treated Plaintiff for an ear infection in May 1999.  (Id. at 300, 418.)  Seven months later, in December, he treated Plaintiff for a fever and cold.  (Id. at 299, 417.)

Dr. Homer Nash noted at Plaintiff's annual examination in June 2000 that his language development continued to improve with speech therapy.  (Id. at 298, 416.)

In March 2001, Plaintiff was treated for congestion and a cough by a pediatric nurse practitioner.  (Id. at 297, 415.)  Four days after an emergency room visit on May 13 for wheezing, Plaintiff was diagnosed by Dr. Nash with mild, intermittent asthma.  (Id. at 296, 414.)  He was given a steroid and Augmentin, and was to return in six months.  (Id.)

He did not return until nine months later, on February 1, 2002, he had an annual examination.  (Id. at 412.)  A pediatric nurse practitioner noted that Plaintiff had problems with asthma and allergies, and also had some developmental delay.  (Id. at 412.)  He was reportedly "doing very well" in special education.  (Id.)  Three weeks later,
a pediatric nurse practitioner treated a rash on Plaintiff's right side.  (Id. at 293, 411.)
Plaintiff was treated by Dr. Nash in April for blisters on his left ankle.  (Id. at 292, 410.)
The diagnosis was Impetigo and was to be treated with soap and water and an antibiotic.
(Id.)  Plaintiff was seen by the other pediatric nurse practitioner in September for his complaints of a swollen jaw.  (Id. at 291, 409.)  He had just finished a course of

Prednisone.  (Id.)  On examination, his face appeared not to be swollen and looked normal.  (Id.)  Plaintiff was described as active and busy.  (Id.)  In October, Plaintiff was examined by the pediatric nurse practitioner for complaints of blood in his stool.  (Id. at 290, 408.)  He was described as a "picky eater"; the diagnosis was "blood in stool – eating disorder."  (Id.)  It was noted that he was generally active and playful.  (Id.)  He was referred to a gastroenterologist.  (Id.)

In December 2002, his mother consulted Dr. Nash about Plaintiff's fever.  (Id. at 289, 407.)  He was prescribed Tylenol and was instructed to drink lots of fluids.  (Id.)

In February 2003, Plaintiff was treated by a pediatric nurse practitioner for allergies.  (Id. at 406.)  The following September, he was diagnosed with asthma and was prescribed Concerta.  (Id. at 287, 405.)  His medical record of that date shows a diagnosis of ADHD.  (Id.)  Two months later, his dosage of Concerta was reduced.  (Id. at 286, 404.)  He was described in his medical record of that visit as a "good child" who struggled with class work and academic issues.  (Id.)

At Plaintiff's next visit for medical treatment, in May 2004, his asthma was described as "mild persistent."  (Id. at 402.)  Three months later, he returned for his annual physical.  (Id. at  400.)  It was noted that he was no longer on any medications.  (Id.)  Three weeks later, he had had a fever, pain in his ears, and a decreased appetite. (Id. at 399.)  He was placed on a different medication for his ADHD, Strattera, and was continued on his asthma medication.  (Id.)  It was noted that his mother was trying to find a different

psychiatrist for him.  (Id.)  The next month, Plaintiff was treated for a rash caused by an insect bite.  (Id. at 398.)  Plaintiff returned to the pediatrician's office in December and was treated by a pediatric nurse practitioner for headaches.  (Id. at 397.)

Also before the ALJ were medical records from Daniel Reising, M.D.[7]  (Id. at 433-38.[8])  Dr. Reising saw Plaintiff on May 13, 2004, on referral from his pediatrician.  (Id. at 433, 436.)  He noted that Plaintiff did a "fair amount" of nail biting and scab picking and always had to hold a tissue or paper.  (Id.)  He was easily irritated and possessive.  (Id.)  He had a hard time keeping friends.  (Id.)  Plaintiff worried about being late.[9]  (Id.)  His parents divorced in 2001.  (Id. at 434, 437.)  On examination, Plaintiff was talkative.  (Id. at 435, 438.)  Although he had a "slightly mechanical tone" he was fully coherent and articulative.  (Id.)  His perception was unremarkable, his memory was good, his orientation was not confused, his insight and judgment were fair, his intellect was average, and his behavior was unremarkable.  (Id.)  Dr. Reising listed a diagnosis of ADHD and "CD[10] NOS

---

[7]These records are not signed, nor do they otherwise indicate their source.  Plaintiff's attorney identified them as being from Dr. Reising.

[8]The Court notes that the six pages of records are two sets of three pages each of the same visit.

[9]Plaintiff was reportedly often tardy in first grade.  (Id. at 194.)

[10]Plaintiff asserts in his brief that the "CD" refers to Conduct Disorder.  The Commissioner does not disagree with this interpretation.

[not otherwise specified]" and assessed Plaintiff's Global Assessment of Functioning

("GAF") as 65.[11]  (Id.)  Plaintiff was to follow-up in six to eight weeks.  (Id.)

A Psychological Report to Plaintiff's attorney from Kevin Schuler, Ph.D., reads as

follows:

> On 12-2-04, I had an intake session with Maritha Butler and three sons[, including Plaintiff].  From my handwritten notes, [Plaintiff] was observed by Maritha to be "really aggressive," "very aggressive with his brothers," "yells a lot," "gets mad a lot."  He has been observed to be aggressive and hyperactive at school.  He currently is reportedly to be on Stratera [sic], 25 mg.  From report, he appears to carry a diagnosis of ADHD.

(Id. at 439.)

In October 2003, Plaintiff's speech and language were evaluated by Lori Linder,

M.A., CCC/SLP, pursuant to his mother's request that his SSI benefits be continued.  (Id.

at 313-21.)  Plaintiff was given the Clinical Evaluation of Language Fundamentals - 3

("CELF-3") test to assess his "strengths and weaknesses in word meanings (semantics),

word and sentence structure (morphology and syntax), and recall and retrieval of spoken

language (memory)."  (Id. at 313.)  His scores indicated a mild impairment in expressive

---

[11]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  "Lower GAF scores signify more serious symptoms." **Id.**  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Manual at 34.

language and total language compared to the same-age peers.  (Id.)  His total language score was at the low end of the average range and was 17 points higher than his score in January 2002.  (Id.)  His expressive language score was three points lower than the low score in the average range.  (Id.)  His receptive language score was within normal limits.  (Id.)  "His speech was fully intelligible with a noticeable frontal lisp for /s, z/."  (Id.)  "His language use was confusing at times as he did not introduce topics, misused words and did not provide pertinent information when telling a story."  (Id.)  Ms. Linder additionally observed:

> . . . [Plaintiff] was able to follow complex oral directions, understand sentence structures and understand word associations within the average range.  His expressive language skills were assessed to be mildly impaired. He uses adequate word forms and is able to generate grammatically correct sentences within the normal range, but was below on his ability to imitate sentences verbatim that increased in length and complexity. . . .

(Id. at 314.)  She diagnosed him with an articulation disorder and a mild receptive language disorder.  (Id.)

Also in October 2003, a Childhood Disability Evaluation Form[12] was completed for Plaintiff by non-examining consultants.  (Id. at 122-27.)  His impairments – a mild receptive language disorder, articulation disorder, and fine motor delay – were severe but did not meet or medically equal a listing-level impairment.  (Id. at 122.)  Assessing the affect of these impairments on Plaintiff's ability to function in six domains, the consultants

---

[12]A "Childhood Disability Evaluation Form" is completed for children whose impairments are severe but are not a listed impairment.  See 20 C.F.R. § 416.924(g).

concluded that Plaintiff had a less than marked limitation in the domains of acquiring and using information; interacting and relating with others; and moving about and manipulating objects. (<u>Id.</u> at 125-26.) In the domain of acquiring and using information, it was noted that Plaintiff's teacher had reported that Plaintiff had made progress academically and then had only mild language problems. (<u>Id.</u> at 126.) He showed mild expressive language problems, but no receptive language problems. (<u>Id.</u>) Plaintiff had had significant medical improvement in speech and language and no longer functionally equated with Listing 111.09A.[13] (<u>Id.</u> at 127.) In the domain of moving about and manipulating objects, Plaintiff showed improvement in cutting, writing, and grasping pencils. (<u>Id.</u> at 125.) He had no limitations in the domains of caring for oneself and health and physical well-being. (<u>Id.</u> at 125.) His functioning in the domain of attending and completing tasks was not assessed. (<u>Id.</u> at 126.)

Two months later, a Childhood Disability Evaluation Form was completed by three non-examining consultants, Isabel Mora, M.D.; R. Rocco Cottone, Ph.D.; and Madge Burchyett, B.S. (<u>Id.</u> at 108-13.) Plaintiff's impairments were: ADHD; language impairment in semantics, syntax, and pragmatics; and articulation disorder. (<u>Id.</u> at 108.)

---

[13]Listing 111.09 provides, in relevant part:
111.09 *Communication impairment, associated with documented neurological disorder.* And one of the following:
    A. Documented speech deficit which significantly affects the clarity and content of the speech; . . .

20 C.F.R. Pt. 404, Subpt. P., App. 1.

Assessing Plaintiff's ability to function in six domains, these consultants concluded that Plaintiff had a less than marked limitation in the domains of acquiring and using information; attending and completing tasks; and interacting and relating with others. (Id. at 110.) In the domain of acquiring and using information, it was noted that teacher questionnaires reported deficits in Plaintiff's syntax and semantics that affected his progress and involvement in the general curriculum and in his ability to learn new material. (Id. at 110-11.) Formal testing results were consistent with a less than marked limitation, but functional sampling and reports from the teacher revealed obvious problems in learning. (Id. at 111.) In the domain of attending and completing tasks, Plaintiff had problems daily in staying focused, although the problems were not serious. (Id. at 110.) He made careless mistakes. (Id.) In the domain of interacting and relating with others, a November 2003 teacher questionnaire reported no serious problems; however, an April 2003 questionnaire listed him as impaired in two of five categories. (Id.) Although Plaintiff's speech was intelligible, his verbal expression was confusing and lacked details; he did not maintain eye contact during a conversation and hid his face. (Id. at 111.) He had no limitations in the remaining domains of moving about and manipulating objects; caring for oneself; and health and physical well-being. (Id. at 112.)

As noted above, a hearing was held in February 2004 before a hearing officer pursuant to Ms. Hunter-Butler's request that Plaintiff's SSI benefits continue. (Id. at 93-105.) The officer noted that at the time of the comparison point decision: "[Plaintiff]

exhibited symptoms of severe speech and language delay, characterized by a limited phonetic repertoire, difficulty following simple directions, naming objects and word imitation. His conversational speech was reduced to 25-30% intelligibility, which adversely affected his ability to socialize with other children. [Plaintiff] had a 17 month delay in expressive communication." (Id. at 96.) At the hearing, Plaintiff "correctly and clearly stated his date of birth, age and spelled the name of his school." (Id. at 94.) He liked school, had friends, and played games. (Id.) He did not fight at school and got along with his teachers and the other students. (Id.) Plaintiff's mother testified that Plaintiff was not functioning better. (Id. at 95.) He had difficulty with comprehension and, at times, understanding. (Id.) He did not always appropriately follow directions and instructions. (Id.) He had problems with hyperactivity at school and at home. (Id.) Although his speech and language skills had improved, he continued to have some difficulty expressing himself and correctly pronouncing his words. (Id.) The hearing officer concluded that Plaintiff was no longer disabled, finding that "[Plaintiff] has less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. He has no limitations in moving about and manipulating objects, caring for yourself and health and physical well being." (Id. at 103.)

## The ALJ's Decision

The ALJ first outlined the standard for finding a child disabled under the Act. (Id. at 13-14.) He then noted that when Plaintiff had been awarded benefits, he met Listing

111.09A due to severe speech and language delay.  (<u>Id.</u> at 14.)  He further noted that Plaintiff was alleging a current disability due to speech problems, delayed motor skills, and ADHD.  (<u>Id.</u>)

Next, the ALJ summarized in detail the speech-language pathologist's report of May 2003, the therapist's report of May 2003, the therapist's responses in November 2003 on the speech/language pathology questionnaire, Ms. Linder's evaluation of October 2003, the Belle Center's evaluation of February 2004, Plaintiff's IEPs and reevaluation reports, and his health care records.  (<u>Id.</u> at 14-19.)  After then summarizing Plaintiff's and his mother's hearing testimony, the ALJ found:

> There are no medical records documenting any findings, by the [Plaintiff's] treating physicians, that current treatment, therapies, or structures are inadequate despite strict compliance, and that significant adjustments are required.  There are no medical records documenting any findings by any treating physician that the [Plaintiff] has had long term and adverse mental or physical limitations.  There are no medical records documenting or [sic] prolonged hospitalization since the alleged onset date.  There are no medical records documenting the presence of a chronic impairment characterized by frequent episodes of illness or attacks, or exacerbations and remissions, having a significant impact on the [Plaintiff's] functioning, despite treatment. There is no persuasive evidence that the [Plaintiff] has had a significant number of absences from school casually related to exacerbation of any ailment or disorder.

(<u>Id.</u> at 20.)  The medical evidence did establish a decrease due to medical improvement in the medical severity of Plaintiff's impairments of severe speech and language delay.  (<u>Id.</u> at 21.)  These impairments resulted in fewer and less significant restrictions of Plaintiff's functional capacity as existed when he was originally found to be disabled.  (<u>Id.</u>)

The ALJ next addressed Plaintiff's limitations in the six domains of functioning, concluding that he did not have marked or extreme limitations in acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. (Id. at 21.)  The severity of Plaintiff's speech impairment had diminished with special education services and speech therapy.  (Id.)  Although he spoke with a lisp, his teachers did not have any significant difficulty understanding him.  (Id.)  His fine motor skills were improving with occupational therapy.  (Id.)  There was no basis in the record for the diagnosis of ADHD, and no comments by teachers or therapists of any difficulty with Plaintiff's behavior, with the exception of Plaintiff's current teacher who completed the questionnaire after knowing Plaintiff for only three months.  (Id.)

Although Plaintiff had a current medically determinable impairment of a speech and language disorder, he no longer had such an impairment that resulted in marked or severe functional limitations and was, accordingly, not disabled within the meaning of the Act.

**Legal Standards**

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  **Cox v. Apfel**, 160 F.3d 1203, 1206-07 (8th Cir. 1998).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998); **Bryant v. Apfel**, 141 F.3d 1249, 1250 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from

the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (interim quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child was currently engaged in substantial gainful activity; (2) whether the child suffered severe impairments or a combination of severe impairments; and (3) whether the child's impairments met or equaled any listed impairments. **Neal ex rel. Walker v. Barnhart**, 405 F.3d 685, 688-89 (8th Cir. 2005); **Bryant**, 141 F.3d at 1251. If, as in the instant case, the ALJ finds at step two of the evaluation that a child's impairments are severe, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year. 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." Id. See also 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.

When the question is, as in the instant case, whether there has been a medical improvement in the impairment or impairments that were present at the time of the favorable determination, the "comparison point decision" ("CPD"), this sequential evaluation varies only in that the issue at the first step is whether there has been a medical improvement, if so, at the second step whether the CPD impairment "still meets or medically or functionally equals 'the severity of the listed impairment' that it met or

- 32 -

equaled at the time of the CPD[,]" and, if not, at step three "whether the child is currently disabled, considering all current impairments." Social Security Ruling 05-03p, 2005 WL 952065, *1 (April 27, 2005).

"[I]n general, a child's impairment(s) is of 'listing level severity' if it causes marked limitations in two broad areas of functioning or extreme limitations in one such area." 20 C.F.R. § 416.925(b)(2). A limitation is "marked" for children from age 3 to age 18 if it is "'more than moderate' and 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is also found when the impairment(s) "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. There may be a "marked" limitation in only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairment(s). Id. A limitation is "extreme" for the same age group if the impairment(s) "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). "'Extreme' limitation also means a limitation that is 'more than marked.'"[14] Id.

As noted by the ALJ, there are six broad domains of development or functioning that are addressed when considering the impairments of a child of Plaintiff's age. For Plaintiff's age, the criteria for the first domain, acquiring and using information, is "[w]hen you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv).

---

[14]Plaintiff does not argue that he has an extreme limitation in any domain.

In the second domain, attending and completing tasks, a child's ability to focus and maintain attention, and to begin, carry through, and finish his or her activities, including the pace at which those activities are performed and the ease with which they are changed, is considered. Id. § 416.926a(h). A child of Plaintiff's age "should be able to focus [his or her] attention in a variety of situations in order to follow directions, remember and organize [his or her] school material, and complete classroom and homework assignments." Id. § 416.926a(h)(2)(iv). The third domain is interacting and relating with others. Id. § 416.926a(i). In this domain, a child of Plaintiff's age should, when entering school, "be able to develop more lasting friendships with children" his age. Id. § 416.926a(i)(2)(iv). Such a child should also "begin to understand how to work in groups to create projects and solve problems . . . [and] have an increasing ability to understand another's point of view and to tolerate differences." Id. Indications of limited functioning in this domain are the lack of close friends and difficulties playing sports with rules. Id. § 416.926a(i)(3)(ii) and (iv). The fourth domain is moving about and manipulating objects. Id.§ 416.926a(j). The fifth domain is caring for oneself. Id.§ 416.926a(k). Relevant considerations in this domain are "how well [a child] maintain[s] a healthy emotional and physical state, including how well [the child] get[s] [his] physical and emotional wants and needs met in appropriate ways[.]" Id. (alterations added). A child Plaintiff's age should, among other things, "begin to develop understanding of what is right and wrong, and what is acceptable

and unacceptable behavior." Id. § 416.926a(k)(2)(iv). The sixth domain is health and physical well being. Id. § 416.926a(l).

## **Discussion**

Plaintiff argues that the ALJ's conclusions that he has a less than marked limitation in acquiring and using information, attending and completing tasks, and interacting and relating to others are not supported by substantial evidence. Consequently, the ALJ's conclusion that his impairments do not functionally equal listing-level severity is not supported by substantial evidence. The Commissioner disagrees.

<u>Acquiring and Using Information.</u> Plaintiff specifically argues that his impairments cause him marked difficulties in demonstrating what he has learned in academic assignments, using what he has learned in daily life, and using increasingly complex language to share information and ideas with individuals or groups.

As noted above and by Plaintiff, children in his age range of six to twelve years' old should be able to "learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). Moreover,

> [the child] will need to use these skills in academic situations to demonstrate what [the child] [has] learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. [The child] will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). [The child] should also be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [the child's] own ideas, and by understanding and responding to the opinions of others.

Id. (alterations added).  There is, however, "a range of development and functioning, and . . . not all children within an age category are expected to be able to do all of the activities in the examples of typical functioning."  20 C.F.R. § 416.926a(b)(1) (alteration added).  Thus, "limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation . . ."  Id. (alteration added).

In support of his contention that he has marked limitations in the domain of acquiring and using information, Plaintiff cites his mother's hearing testimony, her responses on the Function Report, questionnaires completed by his first grade and second grade teachers, his 2003 and 2004 IEPs, Ms. Little's letter, Ms. Goodwin's report, and Ms. Linder's report.  These documents support a finding that Plaintiff is limited to some extent in the domain of acquiring and using information; however, substantial evidence on the record as a whole supports the ALJ's finding that the limitation is not marked.

When Plaintiff was six years' old, at the low end of the age range cited above, his mother described him as being limited in his ability to communicate,[15] progress in learning, pay attention, and stay focused.  The next month, he was described as having improved in his ability to follow one-step directions, to identify and use vocabulary in complete sentences, and to communicate his wants or needs in complete sentences.  This same

---

[15]The Court notes that the relevant age groupings when evaluating the severity of speech impairments are not the same as when evaluating a child's functioning under § 416.029a.  See Social Security Ruling 98-1p, 1998 WL 147011,*6  (March 30, 1998).  Rather, a child's chronological age is used if the child is eight years or older and, with certain exceptions not applicable in the instant case, his cognitive level is used if he is less than eight years' old.  Id. at *7.

month, a teacher described him as having, at worst, only a slight problem in three of ten activities involving acquiring and using information. She could understand almost all of his speech. She completed the questionnaire at the end of the school year. On the other hand, the teacher completing one of the questionnaires cited by Plaintiff did so after having known him for only three months. She reported that he needed extra help with reading and math skills, although a 2004 evaluation and IEP both placed his reading and math abilities in at least the average range. She described him as having daily problems organizing his school materials and completing work accurately without careless mistakes; however, she also noted that his frequent tardiness resulted in him not hearing instructions. She too could understand almost all of his speech on the first attempt. The same month this questionnaire was completed, a speech pathologist reported that Plaintiff had improved in his ability to follow one-step directions, to answer questions after listening to a story, and to identify and label vocabulary.

There was also substantial evidence from which the ALJ could conclude that Plaintiff was able to apply his learned skills in practical ways. In April 2003, he could not tell time, zip his pants, or play video games; he was able to do all these as of December 2004. At the beginning of prekindergarten, he spent 630 minutes in a special education classroom, in addition to language and occupational therapy time; by the end of that year, he spent all his time in a regular education classroom, with the exception of his language and occupational therapy time.

<u>Attending and Completing Tasks.</u>  A child in the age range of six years' to twelve

years old'

>should be able to focus [his or her] attention in a variety of situations in
>order to follow directions, remember and organize [the child's] materials,
>and complete classroom and homework assignments.  [The child] should be
>able to concentrate on details and not make careless mistakes in [the child's]
>work (beyond what would be expected in other children [the child's] age
>who do not have impairments. [The child] should be able to change [his or
>her] activities or routines without distracting [one's self] or others, and stay
>on task and in place when appropriate.  [The child] should be able to sustain
>[his or her] attention well enough to participate in group sports, read by
>[himself or herself], and complete family chores.  [The child] should also be
>able to complete a transaction task (e.g., be ready for the school bus, change
>clothes after gym, change classrooms) without extra reminders and
>accommodations.

20 C.F.R. § 416.926a(h)(2)(iv) (alterations added).

    Citing his mother's testimony, her responses on the function report, teachers'

answers to questionnaires, his pediatrician's letter listing his diagnosis of ADHD, and his

second grade progress report, Plaintiff argues that the ALJ erred by not finding he had

marked limitations in being distracted and distracting, organizing school materials,

completing assignments, participating in group sports, completing family chores, changing

activities or routine, and staying in place when appropriate.  Again, there is evidence to

support a finding that Plaintiff was limited in these activities, and substantial evidence to

support the ALJ's finding that any limitation was not marked.

    Plaintiff's mother testified that he *did* not play team sports, not that he *could* not do

so.  On the other hand, Plaintiff testified that he liked to play football, soccer, and

basketball, all group sports. Although his mother reported that Plaintiff had difficulty keeping friends because of his aggressive behavior, his teachers, who saw Plaintiff in a school setting with other children, noted no such problems.

At the end of his kindergarten year, it was noted in his IEP report that he did not behave in such a way as to impede others. On the other hand, within the first month of knowing him, his first grade teacher described his behavior in such terms that it would be distracting, e.g., he talked excessively and was easily distracted by external stimuli. When he was evaluated a few months into first grade, he was only "occasionally" so distracted[16] and was easily refocused. His first grade report card indicated that he met expectations in following rules and working independently. After the first quarter of the second grade, it was noted that his behavior was appropriate when following rules, demonstrating effort, and participating. His second grade teacher assessed him as having only a slight limitation in being able to change activities easily and complete homework on time. Moreover, although Dr. Reising described inappropriate behavior, e.g., picking scabs and difficulties keeping friends, the basis for these descriptions is not evident on the record. The record includes notes of only one visit of unknown duration and with no indication of the source

_____

[16]Relevant to the question of distractability is Plaintiff's diagnosis of ADHD. Plaintiff argues that the ALJ substituted his own medical opinion for that of the pediatricians when questioning the basis for the diagnosis. Plaintiff misinterprets the ALJ's finding. The ALJ questioned the basis for the diagnosis because there was little evidence other than Plaintiff's mother's responses and the answers of a teacher who had known Plaintiff for less than one month that Plaintiff was easily distracted or distracting to others. Moreover, the evidence also is that Plaintiff's ADHD responded well to medication. The issue was the extent to which Plaintiff was distracted or distracting, not whether he had ADHD.

of the observations.  And, he assessed Plaintiff as having a GAF reflective of only "some mild symptoms."  <u>Diagnostic and Statistical Manual of Mental Disorders</u> at 34.

<u>Interacting and Relating with Others.</u>  This domain requires that a child of Plaintiff's age

> should be able to develop more lasting friendships with children who are [the child's] own age.  [The child] should begin to understand how to work in groups to create projects and solve problems.  [The child] should have an increasing ability to understand another's point of view and to tolerate differences.  [The child] should be able to talk to people of all ages, share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv) (alterations added).

Plaintiff's school records and reports consistently describe him as someone who gets along well with his peers and adults.  Indeed, the questionnaire completed by his first grade teacher and cited in support of his two foregoing arguments notes only one activity in this domain in which he had even an obvious problem:  "[i]interpreting meaning of facial expression, body language, hints, sarcasm[.]"  This problem does not reflect a marked limitation in an eight-year old boy.  The records also reflect that teachers and others were able to understand Plaintiff, who easily and readily conversed with them.  Moreover, Dr. Reising assessed Plaintiff as having a GAF score indicative of an ability to have "some meaningful relationships."  <u>Diagnostic and Statistical Manual of Mental Disorders</u> at 34.

There are indications in the record that Plaintiff became frustrated when he was not understood.  This frustration lessened over the course of the school year and was not

expressed in anger. Although his mother testified otherwise, the ALJ could credit the reports of Plaintiff's teachers.

Plaintiff's mother testified that he had no lasting friendships because he could not make or keep friends. Plaintiff, however, testified that he had friends. The record also reflects a change in school when Plaintiff moved to a different municipality, making continuing friendships difficult.

## Conclusion

For the foregoing reasons, the undersigned finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff was no longer disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of February, 2007.